IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:09-CR-138 |
| | ) | |
| DAVID R. POTTER, | ) | (VARLAN/GUYTON) |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. This case came before the Court on March 8, 2010, for a scheduled motion and evidentiary hearing. Assistant United States Attorney Alexandra Hui appeared on behalf of the Government. Attorneys Ralph E. Harwell and Jonathan Harwell represented the Defendant, who was also present. The Court heard the evidence relating to the Defendant's Motion to Suppress Identification [Doc. 12] and permitted the parties to file post-hearing briefs on the identification issue. Both parties filed their supplemental briefs [Docs. 32 and 33] on April 8, 2010. The Court took the motions, the related filings, and the evidence under advisement on April 9, 2010.

**I. POSITIONS OF THE PARTIES**

The Indictment [Doc. 1] charges the Defendant with two counts of robbery of controlled substances valued over $500 from a pharmacy on June 3 and 26, 2009 (Counts 1 and 5,

1

respectively). The Defendant is also charged with two counts of obstructing commerce by the robbery of controlled substances from Walgreens Drugstores (Hobbs Act robberies) occurring on June 3 and 26, 2009 (Counts 3 and 7). Finally, in Counts 2, 4, 6, and 8, the Indictment alleges that the Defendant used, carried, and brandished a firearm in relation to four crimes of violence, those crimes being the robberies alleged in Counts 1, 3, 5, and 7.

The Defendant argues [Docs. 12, 13, and 32] that the "show-up" identification of him on June 26, 2009, violates the Fifth Amendment because it was the product of an unduly suggestive procedure. He also contends that this identification was unreliable. As such, he asks the Court to suppress this identification and any in-court identifications stemming therefrom. The Government responds [Doc. 26 and 33] that although show-up identifications are inherently suggestive, the present identification was sufficiently reliable to render suppression inappropriate.

## II. SUMMARY OF THE TESTIMONY

At the March 8 hearing, the Government presented the testimony of Michael Elmore. Mr. Elmore testified that on June 26, 2009, he was working as a pharmacist at the Walgreens Pharmacy at 4001 Chapman Highway, in Knoxville, Tennessee. At approximately 2:00 a.m. on that date, he saw someone walk up to the counter while he was working at the far end of the pharmacy, away from the counter. When the pharmacy technician called his name and said, "You'll want to get this," he looked up and saw a man standing at the counter. The man was wearing black sweat clothes, a ball cap, and sunglasses. Thinking the man had a question, Mr. Elmore walked to the counter and offered to help him. The man handed Mr. Elmore a white, plastic shopping bag and directed Elmore to "fill it up" with "Oxycontin 80," which was the highest strength of Oxycontin

2

available at that time.

Mr. Elmore testified that in the preceding weeks, the Knoxville-area Walgreens had experienced a number of robberies, at which the perpetrator did not show a weapon. He stated that while he was deciding whether to comply with the man's demands, the man drew a handgun, pulled the slide, and laid it on the counter. At that point, Mr. Elmore decided to comply, walked around the corner to the controlled substances cabinet, and put two bottles of Oxycontin in the bag. Mr. Elmore stated that the controlled substances are kept in a locked cabinet separate from other drugs and that he was the only person on duty that night with access to that cabinet. Mr. Elmore returned to the counter and handed the bag to the man. The man said, "I said fill it up," to which Mr. Elmore replied that was all the 80 milligram Oxycontin that he had. The man then instructed him to "start at the top and go down, 80's, 40's, 20's, so on." Mr. Elmore returned to the controlled substances cabinet and put several bottles of the requested strengths into the bag. While he was there, the man called out to him that he also wanted a bottle of Xanax. As Mr. Elmore walked across the pharmacy to retrieve the Xanax, the man was in sight.

Mr. Elmore stated that he returned to the counter but that the man was not satisfied again. The man said, "I told you to fill it up," and indicated that he had a full magazine and was not afraid to use it. Mr. Elmore returned to the controlled substances cabinet a third time and put several more bottles, including a bulky bottle, into the bag. He returned to the counter and handed the bag to the man. The man said, "Thank you," and walked away. Mr. Elmore estimated that the entire encounter lasted about four minutes. He stated that he interacted with the man each of the times he returned to the counter and that he was able to note the man's appearance. Immediately after the robbery, Mr. Elmore described the perpetrator to the police, telling them that the man wore black

3

sweat pants and sweatshirt, a Tennessee ball cap, dark sunglasses, and dark gloves that were duct-taped to his sweatshirt. Mr. Elmore said he noticed the duct tape on the gloves because the Defendant was holding the gun as it lay on the counter. He stated that the man was large, about six feet and three or four inches tall and weighing over three hundred pounds.

Mr. Elmore testified that the police later brought a suspect to the store for identification. Officers asked Mr. Elmore to come out to a police car in the parking lot. The front window of the squad car was down, and an officer shined his flashlight on the suspect's face. Mr. Elmore testified that he identified the suspect in the car as the man who robbed the pharmacy. Mr. Elmore stated that man was the Defendant. He said he was one hundred percent positive about his identification because of the suspect's build and the shape of his face and cheekbones.

Mr. Elmore stated that when he first began working at Walgreens, he had received training on how to respond during a robbery. He said that a training video had instructed him to notice all the detail that he could and to avoid prolonged direct eye contact. Mr. Elmore stated that avoiding direct eye contact was not an issue during the June 26 robbery because the perpetrator was wearing sunglasses. Mr. Elmore said that he focused on the man's body and hands during the robbery. He believed that during the four-minute encounter, he was able to gather sufficient details to identify the robber.

On cross-examination, Mr. Elmore testified that his first interaction with the perpetrator at the counter lasted about thirty seconds. The remaining interactions at the counter lasted approximately ten to fifteen seconds. Mr. Elmore confirmed that during these interactions, he was not looking directly at the perpetrator's eyes. Instead, Mr. Elmore continually glanced at the perpetrator and then away. Mr. Elmore said that during the robbery, he was calm but that he was

4

also worried about his own safety. He called 911 that evening and reported the robbery. The police came to the pharmacy. Later, an officer who was at the pharmacy counter told Mr. Elmore that the police had stopped someone who resembled the description that Elmore had given. He said he was under the impression that the police believed they had stopped the man who had robbed the pharmacy. The person was brought to the pharmacy, and Mr. Elmore was told that he needed to go out and identify the person. At that time, he understood that the individual in the car was the man the police had stopped. Mr. Elmore stated that when the officer shined his flashlight into the back seat of the patrol car, he could see the person's head and shoulders. The person was not wearing a hat or sunglasses. Mr. Elmore could not see the person's hands to determine if he was wearing gloves. Mr. Elmore said that in the month before the June 26 robbery, he was aware of six or seven other pharmacy robberies in the area.

On redirect examination, Mr. Elmore stated that one to one and one-half hours elapsed between the robbery and the identification. Although he was not able to see the clothing of the man in the police car, he was still one hundred percent certain that the man in the police car was the robber. He did not review any surveillance videos between the robbery and the identification.

Officer John Pickens testified that he had served as a patrol officer for the Knoxville Police Department (KPD) for the past three years. He was on patrol on the evening of June 26, 2009, when he received a radio call regarding a robbery in progress at Walgreens at 4001 Chapman Highway. A store clerk had called the police and was updating them from behind the photo shop as the robbery progressed. Officer Pickens was two miles away, and as he approached Walgreens, the perpetrator was pulling out of the parking lot. A store clerk was in the parking lot and pointed the police in the direction of southbound Chapman Highway. Officer Pickens testified that there

5

was very little traffic at that time of the early morning and that he attempted to catch up to tail lights that he saw at a traffic light ahead. From the radio call, he had received a description of the perpetrator's vehicle as a silver Toyota Corolla with tinted windows and no license tag. When he drew closer to the vehicle, he saw that it met that description. Officer Pickens activated his emergency equipment, and the Toyota sped away. Officer Pickens pursued the Toyota, but his supervisor terminated the chase due to the danger from the high speeds involved and the proximity to a busy intersection. Officer Pickens said that at one point during the chase, he was traveling at one hundred eighteen miles per hour. After the chase was terminated, he returned to Walgreens to gather information about the robbery.

Officer Pickens stated that he spoke with the pharmacist, the pharmacy technician, the clerk who called 911, and another clerk who was in the room where the cameras are located during the robbery. The clerk who had contacted 911 told Officer Pickens that she had noticed an individual acting strangely because he barely spoke and immediately went toward the pharmacy inside the store. All four employees with whom Officer Pickens spoke described the perpetrator as a heavy-set white male wearing dark-colored sweats, an orange hat, sunglasses, and gloves. He said that the pharmacist provided a complete and precise description.

Officer Pickens testified that the police subsequently arrested a suspect and brought him to the store approximately forty-five minutes after the car chase. The suspect remained handcuffed in an undercover police car while Officer Pickens brought the pharmacist and the pharmacy technician outside for a show-up identification. He said that the suspect remained handcuffed in the vehicle because he was considered a flight risk after the earlier car chase. Within ten to fifteen seconds of viewing the suspect, the pharmacist and the pharmacy technician each

6

independently identified the suspect as the person who had robbed the Walgreens. They both appeared to be one hundred percent certain about their identifications. Officer Pickins testified that the descriptions of the perpetrator were accurate as to the suspect's clothing and appearance. He stated that due to the time of morning, it would have taken another one and one-half hours for an investigator to conduct a line-up identification. He was concerned that the witnesses' memories might be stale if they waited for that procedure.

Officer Pickens testified about a video recording [Exhibit 1] of the show-up identification. The pharmacist was brought to the police car containing the suspect and said "Yeah," which Officer Pickens took to mean that the suspect was the person who robbed the pharmacy. The pharmacy technician was brought to the police car containing the suspect independently, and according to Officer Pickens, she also positively identified the suspect as being the robber. Officer Pickens testified that the Defendant was the person sitting in the police car.

On cross-examination, Officer Pickens testified that the car he chased that night was a recent model, four-door Toyota with tinted windows. He was aware that a car matching that description was stopped on Pellissippi Parkway, that the car was searched, and that evidence was found in the car. Officer Pickens testified that as a part of the description he had received, he knew that the perpetrator had duct-taped his gloves. At the time that the Defendant, who was the driver of that Toyota, was brought to Walgreens, the search for the robbery suspect was no longer ongoing because the officers believed they had found the perpetrator.

Officer Pickens stated that the pharmacist and pharmacy technician were standing with him and overheard radio transmissions regarding a felony stop of a car that matched the description of the car involved in the robbery. Thus, the pharmacist and pharmacy technician knew

7

that someone had been stopped and was being brought to Walgreens for an identification. Officer Perkins stated that although four or five officers were at the scene of the identification and the Defendant is a large man, he still believed the Defendant needed to be detained in the police car during the identification because he was a flight risk. Just before the pharmacist and the pharmacy technician viewed the Defendant in the parking lot, Officer Pickens told them, "I want you to take a look at somebody and tell me what you think." He said that the pharmacist's "Yeah" was the only indication the pharmacist gave regarding the identification. The pharmacy technician said "Yes" or "Yep," although her response was not audible on the recording. The view the pharmacist and pharmacy technician had of the Defendant was mostly his face, and he was not wearing sunglasses or an orange hat. The Defendant's hands were behind his back and could not be seen during the identification.

## IV. ANALYSIS

The Due Process clause of the Fifth Amendment protects against the admission of a pretrial identification that is so "'impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" Thigpen v. Cory, 804 F.2d 893, 895 (6th Cir. 1986) (quoting Simmons v. U.S., 390 U.S. 377, 384 (1968)). "Suggestive confrontations are disapproved because they increase the likelihood of misidentification[.]" Neil v. Biggers, 409 U.S. 188, 198 (1972). Nevertheless, the use of a suggestive identification procedure does not compel suppression of the identification, if the identification can be deemed reliable. Id. at 199; see also Manson v. Brathwaite, 432 U.S. 98, 114 (1977) (holding that "reliability is the linchpin" of the analysis). To evaluate the constitutionality of an identification, the Court uses a two-step process, first assessing whether the identification procedure was unduly suggestive and second determining if the totality

of the circumstances reveal that the resulting identification was nonetheless reliable. Mills v. Cason, 572 F.3d 246, 251 (6th Cir. 2009).

Turning to the first step of the analysis, the Court must evaluate whether the identification procedure employed was unduly suggestive. After overhearing that the police believed they had caught the perpetrator, Pharmacist Elmore and the pharmacy technician were brought to the Walgreens parking lot to view a single suspect seated in the rear of a police car. Here, the Defendant contends and the Government concedes that the show-up identification employed was unduly suggestive. Indeed, our appellate court has held that "[a] showup is inherently suggestive. When only one person is presented to a witness, there is a natural tendency for the witness to feel obligated to provide a positive identification." Summitt v. Bordenkircher, 608 F.2d 247, 252 (6th Cir. 1979); jmt aff'd by Watkins v. Sowders, 449 U.S. 341 (1981). The Court finds that the identification procedure employed by the KPD was unduly suggestive.

The Defendant argues for the suppression of the identification because the circumstances of the investigation did not require law enforcement to conduct a show up identification. He points to Officer Pickens' testimony that once the Defendant was apprehended, the search for the perpetrator of the robbery was no longer ongoing. Thus, the Defendant contends that the officers could have taken the time to use a less suggestive identification procedure that night. Moreover, he asserts that the officer's contention that the Defendant was a flight risk and, thus, had to remain in the police car is unfounded in light of the number of officers on the scene. Finally, he argues that the witnesses could have been shielded from radio dispatches and discussions about the Defendant's arrest. The Government responds that once the Court finds that the identification procedure was unduly suggestive, it need not examine the officer's reasons for

9

employing the suggestive procedure. Instead, the Court must only determine whether the identification was reliable despite the suggestive procedure. The Court agrees with the Government. In Manson v. Brathwaite, the Supreme Court considered a split in the federal appellate courts with regard to whether an unduly suggestive identification must be automatically excluded, without regard to its reliability, if the suggestive identification procedures were unnecessary. 432 U.S. at 110. The Court found that the totality of the circumstances approach embraced in Biggers and its predecessors accommodated the interest of fairness inherent in due process. Id. at 113. Thus, it deemed "reliability [to be] the linchpin in determining the admissibility of identification testimony[.]" Accordingly, the Court need not consider whether the KPD officers could have employed a less suggestive identification procedure.

Next, the Court turns to the second step of the analysis, whether the identification was reliable even though the procedures employed were unduly suggestive. With regard to this step, the Supreme Court has crafted five factors to assess the reliability of an identification despite a suggestive procedure: (1) the "opportunity of the witness to view the criminal at the time of the crime," (2) "the witness' degree of attention," (3) "the accuracy of the witness' prior description of the criminal," (4) "the level of certainty demonstrated by the witness at the confrontation, and" (5) "the length of time between the crime and the confrontation." Biggers, 409 U.S. at 199-200.

In the present case, the Court finds that Mr. Elmore had sufficient opportunity to view the perpetrator at the time of the robbery. He testified that during the approximate four-minute robbery, he interacted with the perpetrator for about one minute at the counter and also viewed him while crossing the pharmacy to retrieve certain drugs. Although he did not make eye contact with the perpetrator, who was wearing sunglasses, he did speak with him and face him at the counter on

10

three occasions. Given the fact that Mr. Elmore was working in the pharmacy that night and initially believed the robber to be a customer, the Court concludes that the lighting must have been adequate for Mr. Elmore to see the perpetrator. The Court finds these facts to be similar to those in Manson, in which the witness, an undercover officer, stood within two feet of the seller for "moments" and had a conversation while the apartment door was opened twice during a two-to-three-minute transaction. Manson, 432 U.S. at 114.

As for Mr. Elmore's degree of attention, the Court finds that he interacted with the robber, rather than being a passive observer. Although he was worried about his safety, Mr. Elmore described himself as calm during the robbery. He also testified that he had received some training about how to react during a robbery and had been taught to notice as much detail as possible. The Court next looks to the accuracy of Mr. Elmore's description of the perpetrator. He testified that he told police that the robber was a large man, six feet and three or four inches tall and weighing over three hundred pounds. He described the robber as wearing black sweat clothes, a Tennessee ball cap, dark sunglasses, and dark gloves that were duct-taped to his sweatshirt. Officer Pickens testified that this description turned out to be "absolutely correct."

The fourth Biggers factor is the level of certainty that the witness has at the time of the identification. In the present case, Mr. Elmore testified that he was one hundred percent certain that the man in the car was the robber. He stated that although the person seated in the police car was not wearing sunglasses or a ball cap, he was able to tell this was the perpetrator based upon the suspect's general build and the shape of his face. Officer Pickens testified that Mr. Elmore identified the suspect as the robber "[a]lmost immediately" and after only ten to fifteen seconds. He characterized Mr. Elmore as having "[a]bsolute one hundred percent certainty" that the suspect was

11

the perpetrator.

Finally, the Court looks to the length of time between the crime and the identification. Here, Mr. Elmore testified that one to one and one-half hours elapsed between the robbery and the identification. Officer Pickens testified that approximately forty-five minutes to one hour passed between the car chase and the identification. The Court finds this time frame to be very brief in comparison to others in the case law. See Mason, 432 U.S. at 116 (upholding the reliability of an identification that occurred two days after the crime; Biggers, 409 U.S. at 201 (observing that in many cases a lapse of seven-months would have suggested the identification was unreliable but that here the victim did not identify other persons before the identification of the defendant); Haliym v. Mitchell, 492 F.3d 680, 706 (6th Cir. 2007) (observing that the "delay [between the crime and the identification], which occurred over a matter of days, was not long by the standards of our case law"); United States v. Gatewood, 230 F.3d 186, 193 (6th Cir. 2000) (affirming admission of identification occurring "only four days" after the crime); Ledbetter v. Edwards, 35 F.3d 1062, 1073 (6th Cir. 1994) (determining that identification of perpetrator within days of the crime was reliable); United States v. Hamilton, 684 F.2d 380, 383 (6th Cir. 1982) (finding reliable identifications that occurred four and eleven days following the crimes).

Thus, the Court finds that all five of the Biggers factors show the identification to be reliable. Looking at the totality of the circumstances in this case, the Court determines that the identification is reliable despite the suggestiveness of the identification procedures. Like the Court in Mason, the undersigned "cannot say that under all the circumstances of this case there is 'a very substantial likelihood of irreparable misidentification.' Short of that point, such evidence is for the jury to weigh." 432 U.S. at 116.

## V. CONCLUSION

After carefully considering the parties' arguments and the relevant legal authorities, the Court finds no basis to suppress the evidence from the show-up identification on June 26, 2009. For the reasons set forth herein, the Court **RECOMMENDS** that Defendant's Motion to Suppress Identification [**Doc. 12**] be **DENIED**.[1]

                Respectfully submitted,

                 s/ H. Bruce Guyton
                 United States Magistrate Judge

---

[1] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).