UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| v. | ) | No.: | 3:09-CR-138 |
| | ) | | (VARLAN/GUYTON) |
| DAVID R. POTTER, | ) | | |
| | ) | | |
| Defendant. | ) | | |

**MEMORANDUM OPINION AND ORDER**

This criminal action is before the Court on the Report and Recommendation (the "R&R") [Doc. 34], issued by United States Magistrate Judge H. Bruce Guyton on May 11, 2010. Defendant David R. Potter is charged in the indictment in this case [Doc. 1] with two counts of robbery of controlled substances valued over $500 from a pharmacy, in violation of 18 U.S.C. § 2118(a) and (c) (Counts 1 and 5); two counts of obstructing commerce by the robbery of controlled substances, in violation of 18 U.S.C. § 1951 (Counts 3 and 7); and four counts of using, carrying, and brandishing a firearm in relation to four crimes of violence, those being the crimes alleged in Counts 1, 3, 5, and 7, in violation of 18 U.S.C. § 924(c) (Counts 2, 4, 6, and 8).

On January 7, 2010, defendant filed a Motion to Suppress Identification [Doc. 12], arguing that the "show-up" identification of him on June 26, 2009 violates the Fifth Amendment because it was the product of an unduly suggestive identification procedure. Defendant also contends that the identification was unreliable. Defendant moved to suppress

this identification and any in-court identifications stemming therefrom [Doc. 12]. The United States filed a response in opposition on February 26, 2010 [Doc. 26]. The government conceded that the show-up identification was inherently suggestive, but argued that the identification was sufficiently reliable to render suppression inappropriate. Magistrate Judge Guyton held a motion and evidentiary hearing on the motion, among others, on March 8, 2010 [*see* Doc. 29].[1] Following the presentation of evidence at the hearing, the Court permitted the parties to file post-hearing briefs on the identification issue. Both parties filed supplemental briefs [Docs. 32, 33] on April 8, 2010.

Magistrate Judge Guyton issued the R&R on May 11, 2010, finding that the identification procedure at issue was unduly suggestive but nevertheless reliable based on the totality of the circumstances. Accordingly, Judge Guyton recommended that defendant's motion to suppress identification be denied.

Defendant filed objections to the R&R on May 20, 2010 [Doc. 39]. The government filed a response to the objections on June 3, 2010 [Doc. 44]. This matter is before the Court on defendant's objections.

I.  **Standard of Review**

As required by 28 U.S.C. § 636(b)(1), the Court has undertaken a *de novo* review of those portions of the R&R to which defendant has objected. In doing so, the Court has

---

[1] Also at the March 8, 2010 hearing, Magistrate Judge Guyton heard evidence relating to defendant's motion to dismiss the indictment [Doc. 18] and various other pretrial motions. The magistrate judge issued a separate report and recommendation [Doc. 37] on the motion to dismiss indictment and a memorandum and order [Doc. 35] on the other pretrial motions. The report and recommendation on the motion to dismiss the indictment is the subject of a separate memorandum opinion and order.

carefully considered Magistrate Judge Guyton's R&R [Doc. 34], the underlying and supporting briefs, the hearing transcript [Docs. 12, 13, 26, 29, 32, 33], and the parties' briefs regarding the pending objections [Docs. 39, 43], all in light of the relevant law. For the reasons set forth herein, the Court will overrule defendant's objections, accept in whole the R&R, and deny the motion to suppress.

**II.     Summary of Testimony and Exhibits[2]**

At the March 8, 2010 hearing, the government presented the testimony of Michael Elmore ("Mr. Elmore"). Mr. Elmore testified that on June 26, 2009, he was working as a pharmacist at the Walgreens Pharmacy at 4001 Chapman Highway, in Knoxville, Tennessee. On that date, at approximately 2:00 A.M., he saw someone walk up to the counter while he was working at the far end of the pharmacy, away from the counter. When the pharmacy technician called his name and said, "You'll want to get this," Mr. Elmore looked up and saw a man standing at the counter. The man was wearing black sweat clothes, a ball cap, and sunglasses. Thinking the man had a question, Mr. Elmore walked to the counter and offered to help. The man handed Mr. Elmore a white, plastic shopping bag and directed Mr. Elmore to "fill it up" with "Oxycontin 80."

Mr. Elmore testified that in the preceding weeks, Knoxville-area Walgreens had experienced a number of robberies at which the perpetrator did not show a weapon. Mr.

---

[2] The testimony and relevant exhibits from the motion and evidentiary hearing on March 8, 2010 are thoroughly summarized in the R&R [*see* Doc. 29]. Defendant has not objected to the magistrate judge's recitation of the evidence adduced at the hearing and that summary is repeated herein.

3

Elmore stated that while he was deciding whether to comply with the man's demands, the man drew a handgun, pulled the slide, and laid it on the counter. At that point, Mr. Elmore decided to comply. He walked around the corner to the controlled substances cabinet, and put two bottles of Oxycontin in the bag. Mr. Elmore stated that the controlled substances are kept in a locked cabinet separate from other drugs and that he was the only person on duty that night with access to that cabinet. Mr. Elmore returned to the counter and handed the bag to the man. The man said, "I said fill it up," to which Mr. Elmore replied that was all the 80 milligram Oxycontin that he had. The man then instructed him to "start at the top and go down, 80's, 40's, 20's, so on." Mr. Elmore returned to the controlled substances cabinet and put several bottles of the requested strengths into the bag. While he was there, the man called out to him that he also wanted a bottle of Xanax. As Mr. Elmore walked across the pharmacy to retrieve the Xanax, the man was in his sight.

Mr. Elmore stated that he returned to the counter but the man was again not satisfied. The man said, "I told you to fill it up," and indicated that he had a full magazine and was not afraid to use it. Mr. Elmore returned to the controlled substances cabinet a third time and put several more bottles, including a bulky bottle, into the bag. He returned to the counter and handed the bag to the man. The man said, "Thank you," and walked away. Mr. Elmore estimated that the entire encounter lasted about four minutes. He stated that he interacted with the man each of the times he returned to the counter and that he was able to note the man's appearance. Immediately after the robbery, Mr. Elmore described the perpetrator to the police, telling them that the man wore black sweat pants and sweatshirt, a Tennessee ball

4

cap, dark sunglasses, and dark gloves that were duct-taped to his sweatshirt. Mr. Elmore said he noticed the duct-tape on the man's gloves because he was holding the gun as it lay on the counter. Mr. Elmore stated that the man was large, about six feet and three or four inches tall and weighed over three hundred pounds.

Mr. Elmore testified that the police later brought a suspect to the store for identification. Officers asked Mr. Elmore to come out to a police car in the parking lot. The front window of the squad car was down, and an officer shined his flashlight on the suspect's face. Mr. Elmore testified that he identified the suspect in the car as the man who robbed the pharmacy. Mr. Elmore stated at the hearing that the man was the defendant. Mr. Elmore said he was one hundred percent positive about his identification because of the suspect's build and the shape of his face and cheekbones. Mr. Elmore stated that when he first began working at Walgreens, he had received training on how to respond during a robbery. He said that a training video had instructed him to notice all the detail that he could and to avoid prolonged direct eye contact. Mr. Elmore stated that avoiding direct eye contact was not an issue during the June 26 robbery because the perpetrator was wearing sunglasses. Mr. Elmore said that he focused on the man's body and hands during the robbery and he believed that he was able to gather sufficient details to identify the robber during the four-minute encounter.

On cross-examination, Mr. Elmore testified that his first interaction at the pharmacy counter with the perpetrator lasted about thirty seconds. The remaining interactions at the counter lasted approximately ten to fifteen seconds. Mr. Elmore confirmed that during these

5

interactions, he was not looking directly at the perpetrator's eyes. Instead, Mr. Elmore continually glanced at the perpetrator and then away. Mr. Elmore said that during the robbery, he was calm but also worried about his own safety. Mr. Elmore called 911 that evening and reported the robbery. The police came to the pharmacy. Later, an officer who was at the pharmacy counter told Mr. Elmore that the police had stopped someone who resembled the description he had given. Mr. Elmore said he was under the impression that the police believed they had stopped the man who had robbed the pharmacy. The person was brought to the pharmacy, and Mr. Elmore was told that he needed to go out and identify the person. At that time, Mr. Elmore understood that the individual in the car was the man the police had stopped. Mr. Elmore stated that when the officer shined his flashlight into the back seat of the patrol car, he could see the person's head and shoulders. The person was not wearing a hat or sunglasses. Mr. Elmore could not see the person's hands to determine if he was wearing gloves. Mr. Elmore also said that in the month before the June 26 robbery, he was aware of six or seven other pharmacy robberies in the area.

On redirect examination, Mr. Elmore stated that one to one and one-half hours elapsed between the robbery and the identification. Although he was not able to see the clothing of the man in the police car, Mr. Elmore was still one hundred percent certain that the man in the police car was the robber. He did not review any surveillance videos between the robbery and the identification.

Officer John Pickens ("Officer Pickens") testified that he had served as a patrol officer for the Knoxville Police Department ("KPD") for the past three years. He was on patrol on

the evening of June 26, 2009, when he received a radio call regarding a robbery in progress at Walgreens at 4001 Chapman Highway. A store clerk had called the police and was updating them from behind the photo shop as the robbery progressed. Officer Pickens was two miles away, and as he approached Walgreens, the perpetrator was pulling out of the parking lot. A store clerk was in the parking lot and pointed the police in the direction of southbound Chapman Highway. Officer Pickens testified that there was very little traffic at that time of the early morning and that he attempted to catch up to tail lights that he saw at a traffic light ahead. From the radio call, he had received a description of the perpetrator's vehicle as a silver Toyota Corolla with tinted windows and no license tag. When Officer Pickens drew closer to the vehicle, he saw that it met that description. Officer Pickens activated his emergency equipment, and the Toyota sped away. Officer Pickens pursued the Toyota, but his supervisor terminated the chase due to the danger from the high speeds involved and the proximity to a busy intersection. Officer Pickens said that at one point during the chase, he was traveling at one hundred eighteen miles per hour. After the chase was terminated, he returned to Walgreens to gather information about the robbery.

Officer Pickens stated that he spoke with the pharmacist, the pharmacy technician, the clerk who called 911, and another clerk who was in the room where the cameras are located during the robbery. The clerk who had contacted 911 told Officer Pickens that she had noticed an individual acting strangely because he barely spoke and immediately went toward the pharmacy inside the store. All four employees with whom Officer Pickens spoke described the perpetrator as a heavy-set white male wearing dark-colored sweats, an orange

7

hat, sunglasses, and gloves. He said that the pharmacist provided a complete and precise description.

Officer Pickens testified that the police subsequently arrested a suspect and brought him to the store approximately forty-five minutes after the car chase. The suspect remained handcuffed in an undercover police car while Officer Pickens brought the pharmacist and the pharmacy technician outside for a show-up identification. He said that the suspect remained handcuffed in the vehicle because he was considered a flight risk after the earlier car chase. Within ten to fifteen seconds of viewing the suspect, the pharmacist and the pharmacy technician each independently identified the suspect as the person who had robbed the Walgreens. They both appeared to be one hundred percent certain about their identifications. Officer Pickins testified that the descriptions of the perpetrator were accurate as to the suspect's clothing and appearance. He stated that due to the time of morning, it would have taken another one and one-half hours for an investigator to conduct a line-up identification. He was concerned that the witnesses' memories might be stale if they waited for that procedure.

Officer Pickens testified about a video recording [Exhibit 1] of the show-up identification. The pharmacist was brought to the police car containing the suspect and said "Yeah," which Officer Pickens took to mean that the suspect was the person who robbed the pharmacy. The pharmacy technician was brought to the police car containing the suspect independently, and according to Officer Pickens, she also positively identified the suspect

as being the robber. Officer Pickens testified that the defendant was the person sitting in the police car.

On cross-examination, Officer Pickens testified that the car he chased that night was a recent model, four-door Toyota with tinted windows. He was aware that a car matching that description was stopped on Pellissippi Parkway, that the car was searched, and that evidence was found in the car. Officer Pickens testified that as a part of the description he had received, he knew that the perpetrator had duct-taped his gloves. At the time that the defendant, who was the driver of that Toyota, was brought to Walgreens, the search for the robbery suspect was no longer ongoing because the officers believed they had found the perpetrator.

Officer Pickens stated that the pharmacist and pharmacy technician were standing with him and overheard radio transmissions regarding a felony stop of a car that matched the description of the car involved in the robbery. Thus, the pharmacist and pharmacy technician knew that someone had been stopped and was being brought to Walgreens for an identification. Officer Perkins stated that although four or five officers were at the scene of the identification, the defendant is a large man and he still believed the defendant needed to be detained in the police car during the identification because he was a flight risk. Just before the pharmacist and the pharmacy technician viewed the defendant in the parking lot, Officer Pickens told them, "I want you to take a look at somebody and tell me what you think." He said that the pharmacist's "Yeah" was the only indication the pharmacist gave regarding the identification. The pharmacy technician said "Yes" or "Yep," although her

9

response was not audible on the recording. The view the pharmacist and pharmacy technician had of the defendant was mostly his face, and he was not wearing sunglasses or an orange hat. The defendant's hands were behind his back and could not be seen during the identification.

**III. Analysis**

Defendant makes three objections to the R&R. First, defendant objects to Magistrate Judge Guyton's application of the five factors identified in *Neil v. Biggers ("Biggers")*, 409 U.S. 188 (1972) and utilized by the U. S. Court of Appeals for the Sixth Circuit in determining the reliability of a show-up identification. Specifically, defendant objects to Judge Guyton's application of the second, third, and fourth factors. Second, defendant objects to Judge Guyton's due process analysis of the show-up identification, specifically, the magistrate judge's separation of the unduly suggestive inquiry from the inquiry of whether the identification was reliable. Last, defendant argues that the magistrate judge omitted from the R&R any discussion of the pharmacy technician's identification of defendant and thus, because there was no evidence of the reliability of that identification, it should be suppressed. The government has responded in opposition to all defendant's objections and has requested that this Court adopt the R&R in full and deny defendant's motion to suppress identification.

The Court first considers defendant's second objection, followed by defendant's first objection, followed by defendant's third objection.

## A. Due Process Analysis of a "Show-Up" Identification

Defendant argues that the "primary error" in the magistrate judge's approach was "his complete separation of the unduly suggestive nature of the identification from the ultimate conclusion [] of whether the identification was reliable." [Doc. 39, pp. 13-14]. Defendant asserts that after concluding that the identification was suggestive, the magistrate judge erred because he only looked at the five factor test for reliability articulated in *Biggers* in determining whether suppression was warranted [*Id.*]. Defendant asserts that the proper analysis is whether, in viewing the totality of the circumstances, the suggestive nature of the identification outweighs the reliability determination made after considering the five factors identified in *Biggers* [*Id.*, p. 15].

The Court disagrees. As pointed out by the government, to determine whether a suggestive identification "casts an impermissible taint . . . a court utilizes a two-step evaluation." *Mills v. Cason*, 572 F.3d 246, 251 (6th Cir. 2009) (citing *Ledbetter v. Edwards*, 35 F.3d 1062, 1070-71 (6th Cir. 1994)). In *Ledbetter*, the Sixth Circuit described the two-step process as follows:

> The court first considers whether the procedure was unduly suggestive. The defendant bears the burden of proving this element. If the court does find that the procedure was unduly suggestive, it next evaluates the totality of the circumstances to determine whether the identification was nevertheless reliable. Five factors that are considered in assessing the reliability of the identification include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention at the time of observation; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness when confronting the

11

> defendant; and (5) the length of time between the crime and the confrontation.

*Ledbetter*, 33 F.3d at 1070-71 (internal citations omitted). Importantly, even if an identification is found to be "unduly suggestive, an analysis of the totality of the circumstances under the *Biggers* test still assures us that there was no substantial likelihood of misidentification . . . ." *Id.* at 1072; *see also Carter v. Bell*, 218 F.3d 581, 605 (6th Cir. 2000) (stating that "if an identification is reliable, it will be admissible even if the confrontation procedure was suggestive").

Magistrate Judge Guyton followed the proper analysis in analyzing the identification in this case. Defendant asserted and the government conceded that the identification of defendant was unduly suggestive. Judge Guyton then found that, notwithstanding the suggestiveness of the identification, all five of the *Biggers* factors indicating reliability were present and thus, under the totality of the circumstances, the identification was reliable despite the "corrupting effect of the suggestive identification itself." *See Manson v. Brathwaite*, 432 U.S. 98, 114 (1977). Defendant appears to assert that the totality of the circumstances test is a balancing test between the degree of suggestiveness and the *Biggers* factors. However, based on the explicit two-step evaluative test used by the Sixth Circuit and identified by the Supreme Court, this Court does not find the analysis urged by defendant to be correct. Accepting the defendant's analysis of a suggestive identification would transform the two-step test into a balancing test, not the explicit one step, two step process described by case law. Accordingly, defendant's objection is overruled.

### B. Five Factor Test for Reliability

Defendant also objects to Magistrate Judge Guyton's application of three of the five factors utilized by the Sixth Circuit in determining the reliability of an identification. The five factors include: "(1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention at the time of observation; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness when confronting the defendant; and (5) the length of time between the crime and the confrontation." *See Ledbetter*, 35 F.3d at 1071. Defendant objects to Judge Guyton's application of the second, third, and fourth factors.

As to the second factor, "the witness's degree of attention at the time of observation[,]" Judge Guyton found that Mr. Elmore had "interacted with the robber, rather than being a passive observer." [Doc. 34, p. 11]. Defendant argues that Judge Guyton cited no support for his reliance on interaction as being indicative of reliability and asserts that it is far from clear why interacting would lead to a greater accuracy of observation than passive observation.

The Court is not persuaded by this objection. The testimony of Mr. Elmore indicated that he saw the robber, that he was handed a plastic bag by the robber, and that he conversed with the robber. The robber instructed Mr. Elmore three times to collect certain controlled substances from the pharmacy cabinet and Mr. Elmore testified that he was able to note the robber's appearance each time he returned to the pharmacy counter where the robber was standing. While Mr. Elmore testified that he did not look directly into the robber's eyes, he

13

stated that he continually glanced at the robber and then looked away. Mr. Elmore also testified that he focused on the man's body and hands throughout the robbery. The Court sees no reason why such an interaction would be unreliable. *See Manson*, 432 U.S. at 113-15 (stating that the witness "was not a casual or passing observer, as is so often the case with eyewitness identification[,]" when the witness came to the defendant's door for two to three minutes to complete an undercover drug buy).[3] In this case, Mr. Elmore conversed with the robber, focused and complied with his requests, noted his body and hands, handed him a plastic bag, and made a point to note the appearance of the robber—such facts show a level of attention to the robber that, in this case, indicates reliability.

As to the third factor, "the accuracy of the witness's prior description of the criminal[,]" Magistrate Judge Guyton observed that Officer Pickens testified that Mr. Elmore's description of the perpetrator was absolutely correct [Doc. 34, p. 11]. Defendant argues that while there was some correspondence between the description given by Mr. Elmore and the evidence seized from defendant, the relevance of this accuracy is "unclear" because at the time the identification was made, defendant was no longer wearing sunglasses or gloves [Doc. 39, p. 13].

The Sixth Circuit has noted that accuracy "refers to how *particularly* a description matches a suspect[,]" *Thigpen v. Cory*, 804 F.2d 893, 897 (6th Cir. 1986) (emphasis in

---

[3] The Court notes that the eyewitness in *Manson* was a police officer and trained to "pay scrupulous attention to detail[.]" *Manson*, 432 U.S. at 115. In this case, Mr. Elmore testified that he had received training from Walgreens on how to respond to a robbery, including viewing a training video that instructed him to notice all the detail that he could and to avoid prolonged direct eye contact.

original), including weight, build, hairstyle, or facial hair. *Id.* In his objection, defendant neglects to mention that Judge Guyton found that Mr. Elmore also identified other characteristics of the individual he observed, in addition to the sunglasses and gloves. Mr. Elmore recalled "that the robber was a large man, six feet and three or four inches tall and weighing over three hundred pounds. Mr. Elmore also described the robber as wearing black sweat clothes, a Tennessee ball cap, dark sunglasses, and dark gloves that were duct-taped to his sweatshirt." [Doc. 34, p. 11]. Mr. Elmore also testified that he was one hundred percent positive about his identification because of the suspect's build, the shape of his face, and his cheekbones [*Id.*, p. 4]. Officer Pickens also testified that all four employees who saw the robber and whom the officer spoke with described the robber as a heavy-set white male wearing dark colored sweats, an orange hat, sunglasses, and gloves [*Id.*, p. 6]. Moreover, Officer Pickens testified that Mr. Elmore provided a complete and precise description of the man [*Id.*]. Accordingly, because Mr. Elmore's description of the robber was accurate in that he accurately described not only what the robber was wearing–black sweats, sunglasses, a hat, and gloves, but also described his race, height, build, and his facial structure. Thus, the Court finds that because Mr. Elmore was especially particular in his description of the robber, this factor is also indicative of reliability and this objection is overruled.

As to the fourth factor, "the level of certainty demonstrated by the witness when confronting the defendant[,]" Magistrate Judge Guyton noted that Mr. Elmore testified that he was one hundred percent certain that the suspect he identified was the robber, that he was able to tell this because of the suspect's general build and the shape of his face, and that

Officer Pickens testified that Mr. Elmore identified the suspect as the robber almost immediately and with one hundred percent certainty [Doc. 34, pp. 11-12]. Defendant argues that the certainty of a witness's identification should be given very little weight because social science has totally discredited the notion that the certainty of a witness is a sign of accuracy.[4]

The Court will overrule this objection because the Sixth Circuit and its lower courts continue to apply all five factors of the *Biggers* test in determining reliability, including the level of certainty by an eyewitness. The Court acknowledges that the Sixth Circuit has noted the potential unreliability of eyewitness testimony which may oftentimes be given great weight by juries. *See United States v. Smithers*, 212 F.3d 306, 311-12 (6th Cir. 2000). However, after this Court's review of the testimony and the relevant exhibits, the Court finds that Mr. Elmore viewed the robber at a very short distance and had the opportunity to observe his physical appearance, in addition to interacting with him. Clearly, Mr. Elmore was involved in circumstances which presumably demanded his full attention–a robbery in which the perpetrator indicated that he had a loaded handgun. As such, Mr. Elmore's observations

---

[4] In making this argument, defendant cites to *State v. Long*, 721 P.2d 483 (Utah 1986), a case which noted that the "accuracy of an identification is, at times, inversely related to the confidence with which it is made." *Long*, 721 P.2d at 490. In *Long*, the Supreme Court of Utah reversed and remanded to the trial court the conviction of a defendant after a trial in which the court refused to instruct the jury on the defendant's requested cautionary instruction concerning the accuracy of an eyewitness's identification. *Long*, 721 P.2d at 487-95. The *Long* court considered at length the problems with eyewitness identification and analyzed the approaches of several types of cautionary jury instructions. *Id.* However, in this case, the Court's consideration of Mr. Elmore's eyewitness identification is in a different posture than that in the *Long* case because it is the Court itself, and not a jury, that is considering the nature of Mr. Elmore's eyewitness identification.

of the robber were not made causally or without appreciation of his situation. Officer Pickens also testified that Mr. Elmore identified the man "almost immediately" and he was one-hundred percent certain that the man in the car was the robber. "A defendant is denied due process only when the identification evidence is so unreliable that its introduction renders a trial unfair. As long as there is not a substantial likelihood of misidentification, it is the function of the jury to determine the ultimate weight to be given to the identification." *Smith v. Perini*, 723 F.2d 478, 482 (6th Cir. 1983) (quoting *Summit v. Bordenkircher*, 608 F.2d 247, 253 (6th Cir. 1979) (citing *Manson,* 432 U.S. 98)). Accordingly, the Court finds that the magistrate judge did not err in finding that Mr. Elmore's identification was given with a high level of certainty, and this objection is also overruled.

### C. Identification of the Pharmacy Technician

Defendant's final objection is to the show up identification of the pharmacy technician. Defendant asserts that the R&R omitted any discussion of the reliability of the pharmacy technician's identification and that, because her identification of defendant was procedurally the same as Mr. Elmore's, it was unduly suggestive and unreliable. The pharmacy technician did not testify at the hearing because she was out of the country [Doc. 33, p. 1, n.1]. Nevertheless, the government asserts that her identification was reliable for the same reasons that Magistrate Judge Guyton found Mr. Elmore's identification to be reliable and thus, her identification should not be suppressed.

The Court agrees with defendant that the identification by the pharmacy technician was procedurally the same as Mr. Elmore's and thus, it was unduly suggestive. The Court

17

also agrees that the R&R did not discuss whether her identification was reliable. However, after a review and application of the five factors identified in *Biggers* and utilized by the Sixth Circuit, the Court concludes that her identification should not be suppressed because the Court finds it was nevertheless reliable. The Court now reviews the *Biggers* factors as each pertains to the identification of the pharmacy technician.

As to the pharmacy technician's opportunity to view the robber at the time of the crime, the pharmacy technician was the first to see the robber when he came up to the pharmacy counter. The pharmacy technician saw the robber at the pharmacy counter and alerted Mr. Elmore to his presence before the robber began conversing with Mr. Elmore. As such, the pharmacy technician was in a "passive" position to observe the robbery without having to focus her attention on listening to or responding to his requests, a position defendant himself argued was indicative of reliability [*see* Doc. 39, pp. 12-13]. Similar to Mr. Elmore, the pharmacy technician was also a part of an unusual situation in which her attention skills would have been heightened and she would have been poised to notice and pay attention to the robber's appearance.[5]

As to the pharmacy technician's degree of attention, it appears to the Court that the pharmacy technician was aware that the individual at the counter was indeed robbing the pharmacy store of drugs. Thus, as an individual placed in an unusual and most likely

---

[5] Although this is not mentioned in the R&R, most likely because the pharmacy technician was unavailable as a witness and so did not testify at the March 8th hearing, the Court notes that if Mr. Elmore, an employee of Walgreens, viewed a training video regarding what to do in case of a robbery, it is likely that the pharmacy technician, also an employee of Walgreens, viewed the same or a similar training video. *See supra* note 3.

frightening situation, the pharmacy technician most likely viewed the events unfolding around her with heightened attention and appreciation of the circumstances.[6]

As to accuracy, Officer Pickens testified that all four pharmacy employees, including the pharmacy technician, correctly identified the physical appearance of the robber–his weight, build, and race [Doc. 34, p. 6]. The employees were also able to recall the robber's attire, that he wore dark colored sweats, an orange hat, sunglasses, and gloves [*Id.*]. Evidence of such clothing and accessories was found on defendant and in the car he was driving. This level of accuracy is indicative of reliability.

The pharmacy technician's level of certainty was also high. Officer Pickens testified that after only ten to fifteen seconds of independently viewing the suspect, the pharmacy technician was one hundred percent certain about her identification of the suspect as the robber. Further, the pharmacy technician's identification of the suspect was apart from Mr. Elmore's identification and thus her "certainty" was independent of Mr. Elmore's certainty regarding his identification.

Finally, in regard to the length of time between the crime and the identification, the testimony at the hearing indicated that it was about one to one-half hours between the robbery and the identification by both Mr. Elmore and the pharmacy technician. Thus, the analysis of the magistrate judge in regard to the timing of Mr. Elmore's identification applies to the identification of the pharmacy technician as well. Accordingly, the Court finds the

---

[6] Another clerk called the police at the time of the robbery and was updating them on the progress of the robbery as it occurred [Doc. 34, p. 5].

time frame between the pharmacy technician's observation of the robber and her identification to be brief and indicative of reliability.

After considering the application of the five factors embraced in *Biggers*, the Court concludes that, based on a totality of the circumstances, the identification of the pharmacy technician was reliable despite the suggestiveness of the identification procedures. Based on a totality of these circumstances, the Court "cannot say that under all the circumstances of this case there is 'a very substantial likelihood of irreparable misidentification.'" *Manson*, 432 U.S. at 116 (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)). Accordingly, defendant's final objection is also overruled.

## IV. Conclusion

For the reasons set forth above, the Court **OVERRULES** defendant's Objections [Doc. 39] to the Report and Recommendation and **ACCEPTS IN WHOLE** the Report and Recommendation [Doc. 34] by Magistrate Judge Guyton. Accordingly, and because the Court has found no basis to suppress the evidence from the show-up identification on June 26, 2009, defendant's Motion to Suppress Identification [Doc. 12] is **DENIED.**

IT IS SO ORDERED *NUNC PRO TUNC* June 11, 2010.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE